

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MARTIN LUTHER KING JR. FEDERAL BLDG. & U.S. COURTHOUSE
50 WALNUT STREET, P.O. BOX 419
NEWARK, NJ  07101-0419
(973) 645-6340

WILLIAM J. MARTINI
    JUDGE

# LETTER OPINION

March 16, 2009

Joseph J. Ranni
Bonacic, Krahulik & Associates
90 Crystal Run Road, Suite 104
Middletown, New York  10941

    (*Attorney for Plaintiff*)

Eric A. Savage
Littler Mendelson, PC
One Newark Center
Eighth Floor
Newark, New Jersey  07102

    (*Attorney for Defendant*)

    RE:    **Almodovar v. Freeman Decorating Company, et al.**
            **Civ. No. 06-3707 (WJM)**

Dear Counsel:

    This matter comes before the Court on the motion for summary judgment filed by Defendants Freeman Decorating Company and Freeman Decorating Services, Inc. (collectively "Defendant Freeman").  There was no oral argument. Fed. R. Civ. P. 78.  For the reasons stated below, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

**I.      BACKGROUND**[1]

This is an employment discrimination case, brought by a terminated worker, who alleges that his former employer fired him both because of his national origin and in retaliation for filing a complaint with the Equal Employment Opportunity Commission ("EEOC")

Defendant Freeman is a Dallas-based corporation that specializes in the design and assembly of displays for trade shows and conventions. (Declaration of William A. Kuehnle ("Kuehnle Decl.") ¶ 2.) Freeman has a warehouse facility in Kearny, New Jersey. (Kuehnle Decl. ¶ 2.)

Plaintiff Vincent Almodovar, a resident of East Stroudsburg, Pennsylvania, identifies himself as Puerto Rican. Compl. ¶¶ 1, 6. Almodovar was hired as a truck driver/freight handler at the Kearny facility on August 23, 1989. (Pl.'s Counterstatement of Material Facts ("Pl.'s SMF") ¶¶ 12, 40.) After nearly fifteen years of employment, Plaintiff Almodovar was terminated by Defendant Freeman when he arrived at work on February 3, 2004. (Pl's SMF ¶ 40.)

During his tenure at Freeman, Plaintiff Almodovar received both written and verbal discipline for various infractions of company rules. (Pl.'s SMF ¶¶ 21, 35, 36; Defs.'Statement of Undisputed Material Facts ("Defs.'SMF") ¶¶ 6-9.) These infractions included theft of property (i.e. several feet of twine), smoking in a non-smoking area, and sleeping on the job. (Pl.'s SMF ¶ 21; Defs.' SMF ¶¶ 6-7.) Most frequently, however, Almodovar was cited for attendance issues, including arriving late and leaving early. (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Br.") 5-7; Defs. SMF ¶ 6.)

While employed by Defendant Freeman, Almodovar was a member of the Teamsters Local 807. (Pl.'s SMF ¶ 12; Defs.' SMF ¶ 4.) The Collective Bargaining Agreement entered into by Local 807 and Freeman sets out a "progressive disciplinary policy" for Freeman employees. Under this policy, Freeman supervisors were required to deliver several verbal warnings regarding disciplinary infractions before the issuance of a written disciplinary notice. (Declaration of Joseph J. Ranni ("Ranni Decl."), Ex. 13.) In making a termination decision, Freeman was permitted to consider only those written disciplinary notices issued within the preceding nine months. (Pl.'s SMF ¶ 29; Defs.' SMF ¶ 3.) Further, this progressive disciplinary policy required that three separate

---

[1] This section summarizes the undisputed facts presented by the parties, except where otherwise noted.

"Employee Warning Notices" be issued within a nine-month period[2] to justify termination. (Pl.'s Br. 5; Pl.'s SMF ¶ 29.)

During the nine months prior to his termination, Plaintiff Almodovar received one "Employee Warning Notice" letter on November 3, 2003. (Declaration of Eric A. Savage ("Savage Decl.") Ex. Q.)  In addition, during this period, Almodovar received two other written disciplinary warnings, without the "Employee Warning Notice" caption, on July 2, 2003 and January 24, 2004. (Savage Decl. Exs. P, R.)

On November 25, 2003 – just over two months prior to his termination – Plaintiff Almodovar filed a complaint with EEOC, alleging discrimination with respect to his national origin and retaliation. (Savage Decl. Ex. S.) After his firing, Almodovar filed a second EEOC charge, again alleging national origin discrimination and retaliation. (Savage Decl. Ex. T.)

After receipt of a "Right to Sue" notice from the EEOC, Plaintiff Almodovar filed a complaint in this Court on August 10, 2006. (Pl.'s SMF ¶ 9.) Defendants then filed the instant motion for summary judgment after the close of fact discovery.

## II. DISCUSSION

Plaintiff Almodovar brings suit, alleging discriminatory discharge and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et seq.* Specifically, Almodovar claims that he was discharged by Defendant Freeman: (1) because he is Puerto Rican and (2) in retaliation for his filing a complaint with EEOC alleging disparate treatment based on national origin by Freeman.

Defendant Freeman, in turn, portrays Almodovar as a problematic employee, who received an inordinately high number of disciplinary notices. Freeman points to a number of documented infractions, the most grievous and the most frequent of which pertain to Almodovar's alleged attendance issues. In fact, it was after a final instance of lateness that Almodovar was fired. Freeman now moves for summary judgment on all counts. Each claim will be addressed in turn.

---

[2] Reference to the requirement that three "Employee Warning Notices" be issued within the nine-month period preceding termination appears in Plaintiff's papers; however, notably, Defendants' reply does not rebut this assertion.

### A. Summary Judgment Standard

Summary judgment eliminates unfounded claims without resorting to a costly and lengthy trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). However, a court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Celotex*, 477 U.S. at 323. Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

### B. Discriminatory Discharge under Title VII and the NJLAD

Discrimination based on national origin is prohibited under both Title VII and the NJLAD. In general, courts apply a similar analysis to discrimination claims brought pursuant to Title VII and the NJLAD. *See Carmona v. Resorts Int'l Hotel*, 189 N.J. 354, 370, 915 A.2d 518, 528 (N.J. 2007) ("we have frequently looked to case law under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, for guidance in developing standards to govern the resolution of LAD claims."); *Erickson v. Marsh & McLennan Co.*, 117 N.J. 539, 549-50, 569 A.2d 793 (1990) (explaining that New Jersey Supreme Court has adopted methodology of proof used in Title VII cases for use in NJLAD cases).

A claim of discriminatory discharge under Title VII and the NJLAD may be based on either direct or circumstantial evidence. *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 208, 723 A.2d 944, 954 (1999). Where, as here, a plaintiff does not present evidence of direct discrimination, that plaintiff may prove an employer's discriminatory intent through circumstantial evidence using the burden-shifting methodology described by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973).

The *McDonnell Douglas* standard is a three-stage process, the first stage of which requires the plaintiff to prove, by a preponderance of the evidence, a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L. Ed.2d at 677. To establish a prima facie case of discriminatory discharge under the NJLAD, a plaintiff must show that: (1) he belongs to a protected class; (2) he was performing at a level that met his employer's expectations; (3) he was terminated; and (4) his employer

then sought someone else to perform the same work. *Zive v. Stanley Roberts*, 182 N.J. 436, 457 (2005). A Title VII discriminatory discharge claim requires substantially the same elements – "essentially, that [plaintiff] is a member of a protected class and was qualified for an employment position, but that he or she ...was fired from it under circumstances that give rise to an inference of unlawful discrimination." *See Waldron v. SL Industries, Inc.*, 56 F.3d 491, 494 (3d Cir. 1995).

If the plaintiff can establish a *prima facie* case, the burden of production then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the employee termination. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). If the employer can satisfy this burden of production, the burden "then rebounds to plaintiff who must now show by a preponderance of the evidence that the employer's explanation is pretextual." *Id.*

Assuming that Almodovar could set forth the *prima facie* elements, his discriminatory discharge claims fail because he cannot rebut Freeman's proffered nondiscriminatory reason for firing him. Almodovar's poor attendance record appears to be a legitimate basis, in and of itself, for termination. Freeman's attendance records reveal that during 2003, Almodovar was late for work at least forty-six times and left early at least forty-eight times. *See* Ranni Decl. Ex. 17. Almodovar disputes these attendance numbers, claiming that although "it was possible he was late twelve (12) times and possible had requested to leave early twenty-one (21) times, *such was done with the permission of his supervisor*, Mike Conroy." Pl.'s Br. 6.

Even if Almodovar was late only twelve times and left early on only twenty-one occasions, Defendant Freeman provides several letters that belie Almodovar's assertion that he had permission to miss work. For example, in a letter dated April 3, 2003, Director of Operations Wayne Degen wrote to Almodovar: "You say that traffic patterns are the reason for your lateness. I suggested that you adjust your time needed to get to work on time, as I would expect everyone to do." *See* Savage Decl. Ex. O; *see also* Savage Decl. Ex. Q (letter from Degen to Almodovar stating, "At 8:03 A.M., being over two hours late with no call ... you showed up to start the day. You approached Mike Conroy, Warehouse Manager, and mentioned you thought it was a full shop and if you knew it was only Mike Gehler and yourself, you would have given the time up."). Almodovar's repeated tardiness, despite admonitions to the contrary, provide a legitimate non-discriminatory reason for his firing. *See Fuentes*, 32 F.3d at 763 (noting that the defendant bears a relatively light burden in rebutting a *prima facie* case of unlawful discharge).

The burden then shifts to Almodovar to rebut Freeman's explanation. "To discredit the employer's proffered reason ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether

5

discriminatory animus motivated the employer...." *Fuentes*, 32 F.3d at 765.  Here, Almodovar has not presented evidence to show that Freeman's proffered non-discriminatory reason – attendance issues – was either a *post hoc* fabrication or otherwise did not actually motivate his termination.  *Id.* at 764.  While Almodovar points to the racist name-calling that seemingly pervades Freeman's Kearny facility in an attempt to demonstrate discriminatory animus, *see* Savage Decl. Ex. A (deposition of Vincent Almodovar), this name calling, while both repugnant and disturbing, is not enough to overcome the legitimate nondiscriminatory reasons for Almodovar's discharge.[3]

Almodovar has not demonstrated that Puerto Rican animus – and not his repeated tardiness due to traffic patterns and misunderstandings regarding the schedule – motivated his termination.  Accordingly, Defendant Freeman is entitled to summary judgment on Counts One and Two, the discriminatory discharge claims brought under Title VII and the NJLAD.[4]

### C. Retaliation under Title VII and the NJLAD

While the discriminatory discharge claims required an examination of whether Almodovar was fired because he is Puerto Rican, the retaliation counts are different.  Instead, the concern here is whether Almodovar was terminated because of his "protected

---

[3] Further, Almodovar himself engaged in this racist name-calling.  He freely admitted at his deposition that he used racial epithets to refer to his coworkers.  The following is just one illuminating exchange from Almodovar's deposition:

> Q. How often did you refer to or did you call Mario "nigger"?
> A. Every day.
> Q. Was it just when you and he were around or were there others around?
> A. Everybody was around.  That's my buddy.
> Q. Did you ever hear other freight handlers using language which might be considered derogatory based on somebody's nationality, origin or race?
> A. Among the freight handlers?
> Q. Yes.
> A. We used to use it with each other as friends, yes, not offensive.

[4] Defendants also argue that Almodovar's failure to report the allegedly offensive conduct he experienced at Freeman is fatal to his claim, since Freeman had an established anti-harassment policy.  The *Ellerth/Faragher* defense appears to be inapplicable here, however, since Almodovar was fired.  *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct.2257 (1998) ("No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge..."); *Faragher v. Boca Raton*, 524 U.S. 775, 807-08, 118 S.Ct. 2275 (1998).

activity" – here, his EEOC complaint against Defendant Freeman.[5]

To advance a *prima facie* case of retaliation under Title VII and the NJLAD, a plaintiff must show that: (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action. *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 286 (3d Cir. 2001). In addition, New Jersey courts have required that the employee show that he or she engaged in protected activity known to the employer. *Id.* at 286; *Craig v. Suburban Cablevision, Inc.*, 140 N.J. 623, 629, 660 A.2d 505, 508 (1995).

Analysis of NJLAD retaliation claims follows the now-familiar burden-shifting framework established for disparate treatment claims under Title VII and the LAD. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir.1994). Thus, once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action taken.

Looking first at the *prima facie* elements, there are several material facts in dispute. First, Freeman contends that the supervisors involved in the decision to terminate Almodovar were not aware of his protected activity, i.e. the recently filed EEOC charge. Almodovar, however, points to the deposition testimony of Jay Atherton, a Freeman Vice President involved in the termination decision, which indicates that he was aware of the EEOC complaint and requested input from the human resources department on how to handle the termination in light of it. *See* Ranni Decl. Ex. 24 (deposition testimony of Jay Atherton).[6]

---

[5] While Defendants are entitled to summary judgment on discriminatory discharge, Almodovar's failure to prevail on the merits of that claim does not bar a retaliation claim. A victim of retaliation "need not prove the merits of the underlying discrimination complaint" in order to seek redress. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996).

[6] Atherton's statements during his deposition imply that, or at least raise a material question whether, he was aware of the EEOC complaint at the time of Almodovar's discharge:

> Q. Who decided to terminate Jay Almodovar?
> A. Eventually it would be me.
> Q. And it was you?
> A. It was me in conjunction with discussion with our human resources department.
> Q. Why was human resources involved in Mr. Almodovar's circumstance in January of 2004?
> A. I believe that we had already received a claim from the EEOC and that we may have already responded to that claim or were in the process of responding to it.
> ...

Next, Freeman argues that there was no causal link between Almodovar's EEOC complaint and his termination two months later. While Freeman correctly notes that, in general, a close temporal relation between the complaint and firing, by itself, does not compel a finding of retaliation, *see Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996), the evidence bears out additional bases upon which a causal link could be found.

For example, the two-month time period by itself may not be sufficient to find a causal link, but when coupled with the manner in which Almodovar was fired, significant material questions of fact arise. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d. Cir.2000). Almodovar notes that his firing was not in accordance with his Collective Bargaining Agreement, which mandated "progressive discipline." As noted *supra* at Pt. I., under "progressive discipline," only formal Employee Warning Notices received within the previous nine months could be considered in terminating an employee, and three Notices needed to be issued to fire that employee.[7] Almodovar received only one Employee Warning Notice during the nine months prior to his discharge. *See* Savage Decl. Ex. Q. Freeman, however, provides copies of several other written notices.[8] *See* Savage Decl. Exs. P & R. Based on the papers provided, there is an issue of fact as to whether these other notices were Employee Warning Notices or were otherwise sufficient for termination under the "progressive discipline" framework adopted by Freeman. If these other notices were not Employee Warning Letters, Almodovar was terminated shortly after the EEOC complaint in a manner violating the company disciplinary policy. This could establish the requisite causal link. Accordingly, there are

---

A.   I believe that at the time we either had finished putting together our response to the EEOC or were preparing it. We had submitted it to the human resources department Mr. Almodovar's entire file.

[7] There is a genuine issue of material fact regarding the contours of the "progressive discipline" policy, specifically the number, type, and character of the written notices required to be issued before termination of an employee.

[8] Defendants argue that an intervening event between the protected activity and termination severed the causal connection. In support of this, Defendants cite to *Reap v. Cont'l Casualty Co.*, Civ. No. 99-1239, 2002 WL 1498679 (D.N.J. June 28, 2002). The intervening event here is not identified by Defendants, but it appears to be Almodovar's alleged sleeping at work. *See* Savage Decl. Ex. R (letter from Wayne Degen to Almodovar dated January 29, 2004). In weighing a causal connection under these facts, this additional disciplinary infraction is potentially of less importance than Freeman's adherence – or apparent lack thereof – to the "progressive discipline" requirement. The facts are unclear as to whether Freeman issued enough Employee Warning Letters to comport with this self-imposed requirement. Under this disciplinary framework that Freeman assumed for itself, it matters less that an infraction took place than that Freeman followed its own disciplinary rules.

genuine issues of material fact regarding the *prima facie* elements of Almodovar's claim.

Assuming that Almodovar would be able to set forth the *prima facie* elements, the next question is whether Freeman's reasons for terminating his employment are pretextual. Again, Freeman portrays Almodovar as a chronically late employee who committed various other infractions on the job, such as sleeping. This excuse is non-discriminatory and legitimate on its face.

The final issue is whether Almodovar tendered sufficient evidence to overcome the non-retaliatory explanation offered by Freeman. To make this determination, it is necessary to look at the situation portrayed as a whole, as "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Andrews v. City of Phila.*, 895 F.2d 1469, 1484 (3d Cir.1990).

The facts underlying the causal link discussion, *supra*, are particularly relevant here. Construing the facts favorably toward the non-movant, Almodovar, the brief two-month period between the EEOC complaint and termination, coupled with the fact issues listed above, support an inference of pretext. Given the timing of Almodovar's firing and Freeman's potential disregard of "progressive discipline," a reasonable factfinder could determine that Freeman management, already not fond of Almodovar, grew even more frustrated with him once they learned of his EEOC complaint. This frustration led to his termination. *See Fuentes*, 32 F.3d at 765 (stating that to avoid summary judgment, a plaintiff must "put forward such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."). Since there are material facts in dispute on this count, summary judgment must be denied as to the retaliation claims (Counts Three and Four).

### III.    CONCLUSION

In conclusion, Defendant Freeman's motion for summary judgment on the Title VII and NJLAD discriminatory discharge claims is **GRANTED**. Defendant Freeman's motion for summary judgment on the Title VII and NJLAD retaliation claims is **DENIED**. An Order accompanies this Letter Opinion.

　　　　　　　　　　　　　　　　　　　　/s/ William J. Martini  
　　　　　　　　　　　　　　　　　　　　**WILLIAM J. MARTINI, U.S.D.J.**